# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HE Group, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action No. _____ |
| | : | |
| Borough of Middletown and | : | **JURY TRIAL DEMANDED** |
| Al Geosits, in his official capacity as | : | |
| Codes and Zoning Officer of the | : | |
| Borough of Middletown and in his | : | |
| individual capacity, | : | |
| | : | |
| Defendants. | : | |

## Complaint

Plaintiff HE Group, Inc., by undersigned counsel Mette, Evans & Woodside files this complaint against Defendant Borough of Middletown.

**I.  Parties**

1. Plaintiff HE Group, Inc. ("HE"), is a business corporation organized and subsisting pursuant to the laws of the Commonwealth of Pennsylvania that maintains its principal place of business at 460 North Union Street, Borough of Middletown, Dauphin County, Pennsylvania.

2. Defendant Borough of Middletown ("Borough") is a political subdivision of the Commonwealth of Pennsylvania that maintains its principal place of business at 60 West Emaus Street, Borough of Middletown, Dauphin County, Pennsylvania.

3. Defendant Al Geosits ("Geosits") was, except as otherwise stated, at all times relevant hereto the Zoning and Codes Officer of the Borough of Middletown.

4. Geosits' edicts and acts in such position as recounted in this complaint represented the official policy of the Borough of Middletown as to zoning and code compliance matters affecting the development of HE's real estate in the Borough of Middletown.

## II. Jurisdiction & Venue

5. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343, conferring original jurisdiction upon the various district courts of the United States for civil actions authorized by law to be commenced by any person to recover damages under any Act of Congress. This suit is authorized pursuant to 42 U.S.C. § 1983. An award of costs and attorneys fees is authorized pursuant to 42 U.S.C. § 1988.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Middle District of Pennsylvania is the district in which a substantial part of the events giving rise to the claim occurred.

## III. Facts

7. The averments of the foregoing paragraphs are incorporated herein by reference as if set forth at length.

8. HE is the owner of a certain parcel of real estate of approximately one-quarter acre in size improved by a two-story building and limited paved, off-street parking capable of accommodating approximately three vehicles ("Union Street Property").

9. The Union Street Property is situated at the corner of Union Street and High Street in the Borough of Middletown in Dauphin County, Pennsylvania, and has a postal address of 460 North Union Street, Middletown, Pennsylvania 17057.

10. HE stands for "harmony" in the Chinese language.

11. Howard Dong ("Dong") has at all times served as corporate president of HE.

12. In the fall of 2016, HE began to seek a suitable location to establish a sit-down Chinese restaurant in the Borough of Middletown.

13. During such time period HE and its representatives worked with the local zoning officer and code officer to find a location that would not pose zoning or code issues for operation.

14. HE ultimately purchased the Union Street Property on December 16, 2016.

15. Less than an hour after HE had concluded settling on the Union Street Property, the mayor of the Borough of Middletown, James H. Curry, III ("Mayor Curry"), whose principal residence at the time was, and continues to be, across

3

Union Street from the Union Street Property, gathered with another neighbor in front of the building on the property and stated to Dong that he could not open a Chinese restaurant at such location.

16.  The then-zoning officer, Robert Moyer ("Moyer"), visited the Union Street Property on the same day Mayor Curry had confronted Dong, and informed Dong that the mayor had been involved in an argument with certain borough employees because he had not been told that a Chinese restaurant would open at the Union Street Property.

17.  Moyer also advised Dong to "be careful" because the mayor was a lawyer.

18.  Robert Moyer stated to Dong that the mayor has no direct oversight duties concerning the day-to-day operations of the zoning officer or the code enforcement officer.

19.  Several days later, the mayor texted Dong, stating he wanted to meet Dong in person the following day.

20.  Dong was unable to make subsequent contact with the mayor to confirm a time and place for such a meeting, so appeared at the Borough office and spoke with the front desk receptionist who indicated that Dong should attend that night's meeting of the Middletown Historical Restoration Commission ("Historical Commission").

4

21. Dong attended such meeting, but the Historical Commission members were not sure for what purpose Dong had been directed to attend.

22. A member of the Historical Commission later stated to Dong that the mayor had set up the meeting in an effort to make the restaurant "fall."

23. After such meeting, the mayor texted Dong asking how the meeting had gone.

24. On or about December 16, 2016, HE filed an application with the Middletown Zoning Hearing Board ("ZHB") and requested a variance from what Dong understood Borough ordinances to require as a minimum number of off-street parking spaces.

25. As a result of HE's application, a hearing was scheduled before the ZHB for February 13, 2017, but prior to such date, Dong received a call from an agent of the Borough asking Dong to make a written request to cancel the hearing, and further stating that if Dong would go through with the hearing, the planned restaurant could not open.

26. Dong was told, however, that if he requested in writing that the hearing be cancelled, the restaurant would be allowed to open.

27. Dong, desiring to open the restaurant without problems, wrote to request that the hearing be cancelled, and the hearing was in fact cancelled.

28. The eponymously named HE restaurant formally opened on the Union Street Property on August 3, 2017.

29. Less than a month after the restaurant opened, the Borough's new, recently-hired head Zoning and Codes Officer, Al Geosits ("Geosits"), stopped by the restaurant several times, putting his business cards on the windshields of cars outside the restaurant, entering the restaurant, initiating conversation with employees, and stating that neighbors had complained about the restaurant's operations.

30. Geosits' actions disturbed the restaurant's employees and disrupted operations.

31. Geosits at such time also began to pressure HE to plan to create new, off-street parking on the Union Street Property, encouraging HE to make a "neighbor" happy.

32. Dong understood Geosits reference to a "neighbor" to be a reference to Mayor Curry whose primary residence, as noted, was and continues to be directly across Union Street from the Union Street Property.

33. Desiring to avoid complaints by neighbors about parking, HE repeatedly communicated with Geosits over the next several months and submitted engineer-designed proposed plans to develop the Union Street Property to provide for greater off-street parking.

34. Such plans were repeatedly rejected by Geosits for reasons unrelated to actual development of the Union Street Property in accordance with the Borough's ordinance and only for private benefit, such as for the plans' failure to provide for the planting of ten (10) more shrubs along Union Street to block the view looking into the parking lot from the mayor's residence and the plan's failure to add a view-blocking fence along the property purportedly to prevent vehicle lights from shining onto a particular neighbor's property.

35. Dong, believing that he had no choice in order to obtain approval of expanded parking, tentatively acquiesced to such demands.

36. On March 19, 2018, Geosits demanded that Dong's engineer add a 100-year flood control in its plans for the Union Street Property.

37. The Union Street Property is not within a designated 100-year flood plain.

38. Because of Geosits' arbitrary and capricious actions, at about the same time Dong advised Geosits, Mayor Curry and the borough manager that HE no longer intended to seek to develop the property to create greater off-street parking.

39. After sending this email, Geosits went to Curry's house and thereafter to the restaurant, where he stated to Dong that Dong should make another

7

submission, stating that with such submission, a permit for installation of the paved on-site parking would be issued.

40. After Geosits' visit, a newly-hired codes officer, under Geosits' direction, was sent by Geosits to the restaurant, allegedly because of a violation in the sidewalk outside the restaurant.

41. When the officer went to the restaurant, Dong walked with him around the outside of the property, trying to find what might be the source of the complaint.

42. The codes officer pointed out to Dong a single loose brick on the sidewalk in front of the restaurant as a violation of code, indicating that a replacement of the entire sidewalk might be required—a decision to be made by Al Geosits.

43. Although the new codes officer issued a citation to HE for the loose brick, the officer stated that he had a "weird" feeling about having been sent to the restaurant, stated that he felt "used" in the assignment, and assessed no fine against HE.

44. Although no fine was assessed at such time, approximately one year later when Geosits learned that no fine had been assessed, Geosits—with no explanation—sent an invoice to HE for ninety-nine dollars ($99).

45. After protesting the 100-year flood zone stormwater control requirements, Geosits relented, demanding instead stormwater control for a 25-year flood zone.

46. The Union Street Property is not in a designated 25-year flood zone.

47. The permit for installation of paved on-site parking was issued on June 19, 2018; however, the Borough's insistence upon inclusion of stormwater provisions for a 25-year flood zone raised the cost of development significantly.

48. After having spent approximately $10,000 in engineering fees and facing significantly increased charges to achieve an increase of only approximately nine off-street parking spaces, HE decided to stop attempting to work with the Borough because of its wholly arbitrary and capricious handling of every proposal.

49. Dong informed Geosits that HE would not be moving forward on the parking project.

50. Geosits then directed Dong to have a contractor flatten the stones that had been previously placed on the Union Street Property.

51. As directed, Dong hired a contractor to flatten the stone on October 19, 2018.

52. Geosits witnessed the process and approved such work.

53. Then—unexpectedly—on March 19, 2019, Geosits delivered an ultimatum to HE: finish the parking project by complying with the Borough's

9

demands or remove the flattened stone Geosits had witnessed and approved in October 2018.

54. Geosits at such time stated that the flattening of the stone on the Union Street Property had *not* been approved.

55. On March 22, 2019, HE hired a contractor to start the parking project based on the permitted plan, having made a down payment of $7,250 toward an expected final cost of $14,500.

56. On March 24, 2019, HE's contractor moved equipment onto the Union Street Property and on March 25, 2019, began building the parking lot base.

57. On March 26, 2019, Geosits issued a stop work order to HE's contractor.

58. Geosits spoke with the contractor and directed the contractor to move all equipment off the job site, claiming that the work being done had not been permitted.

59. "I don't want to be put behind bars," the contractor told Dong after Geosits left.

60. Geosits' issuance of the stop work order was contrary to Geosits' approval of the placement of the stone on the Union Street Property in October of 2018, which had been used for parking purposes since such time.

10

61. At such time, Geosits insisted upon communicating directly with HE's contractor.

62. Geosits met with the contractor in the Borough office for an extended discussion.

63. After meeting with Geosits, the contractor told Dong that he would provide him with an updated price based on his conversation with Geosits.

64. After waiting for weeks with no further communication from the contractor, Dong contacted the contractor in May of 2019 for an update.

65. The contractor told Dong that he could not discuss anything over the phone or text message, but that the two would have to meet in person.

66. The contractor met Dong on Sunday, May 19, 2019, and said that if he were Dong, he would not even start the parking project, stating that Geosits wanted to "bleed out" HE, which Dong understood to mean that Geosits wanted HE to hemorrhage financially.

67. As a result of Geosits' meeting with the contractor and requirements communicated to him, the contractor increased his quoted price for the project from $14,500 to $40,250, of which $10,000 was designated for construction of a storm water trench, $14,500 was for paving, $3,000 was for concrete, and the additional payment of $12,750, was an additional sum the contractor now required

11

for an anticipated "inch-by-inch" exacting inspection of the project which the contractor stated to Dong he expected Geosits to conduct.

68. Dong informed the contractor that he would be on a company trip from May 20 to June 17, 2019, and that he would need some time to discuss with his leadership team the increased cost necessitated by the Borough's requirements during such period.

69. The day after Dong left for the company trip, Geosits began fining HE at least $500 per day plus costs for alleged violations of Borough ordinances pertaining to permitting requirements.

70. The Borough, acting through Geosits, filed numerous citations in Magisterial District Court 12-2-03 at nos. 223-2019, 224-2019, 225-291, 272-2019, 278-2019, 501-2019, 502-201, 510-2019, 511-2019, 513-201, and 514-2019 ("Citations") and accused HE variously of daily violations of work permit requirements and/or parking regulations under the Borough's local ordinances.

71. In the Citations, the Borough sought thousands of dollars in fines and against HE.

72. The Citations were arbitrary and capricious and directly contrary to the representations and assurances provided to HE by Geosits on behalf of the Borough and were motivated by an improper desire to frustrate HE's lawful business opportunities.

12

73. HE entered not guilty pleas on the Citations before the magisterial district court.

74. On June 25, 2019, the contractor texted Dong to call him because Geosits was not allowing him to begin work on the project.

75. As a result of such phone call, Dong became aware that the Borough was requiring HE to execute a covenant not to sue the Borough in order to proceed with any on-site parking development.

76. Dong refused to execute such a covenant.

77. A hearing on the Citations was scheduled before Magisterial District Court 12-2-03.

78. At the time of the scheduled hearings, Magisterial District Judge Judy directed Dong and Geosits to work together to try to resolve the outstanding issues within 30 days, and Geosits agreed to work with Dong's contractor to move the project forward.

79. However, as a result of Geosits' discussions with HE's contractor, HE's contractor refused to do anything else on the Union Street Property and discussions toward resolution failed.

80. HE has appealed from guilty findings on the Citations in the magisterial district court and is awaiting action on appeal.

## FIRST CAUSE OF ACTION
### Denial of Equal Protection of Laws - Class of One
### U.S. Const. amend. XIV
### (42 U.S.C. § 1983)

81. The averments of the foregoing paragraphs are incorporated herein by reference as if set forth at length.

82. The Borough's demands for the expansion of parking on the Union Street Property as described herein were irrational and wholly arbitrary.

83. HE has been intentionally treated differently from other, similarly situated real estate owners with no rational basis for such difference in treatment.

84. The stormwater control requirements Geosits insisted upon to approve parking development have not been required by the Borough for at least four other properties within a two-block radius of the Union Street Property.

85. Moreover, as the history of Geosits' actions reveal, HE has been treated in an inconsistent and capricious manner, with contradictory directives and orders all of which were intended to cause the HE restaurant to "fall" and to "bleed" the company.

86. The citations were wholly arbitrary and irrational and the product of improper motivations by the Borough and Geosits.

87. As a direct and proximate result of such unequal treatment, HE has sustained out-of-pocket monetary losses of $22,975 in expenditures for

14

engineering and contracting services for which it must be compensated as well as loss of property development opportunity.

WHEREFORE, Plaintiff prays the Court to enter judgment in its favor and against Defendants Borough of Middletown and Al Geosits in his official capacity as stated herein and in his individual capacity, awarding nominal damages, compensatory damages, attorneys fees and costs, enjoining prosecution under the Citations, and granting whatsoever other relief as is just and equitable.

    Respectfully submitted,

    **METTE, EVANS & WOODSIDE**

By: /s/ Aaron D. Martin
_____
Aaron D. Martin
Pa. Atty. I.D. No. 76441
Veronica L. Morrison
Pa. Atty. I.D. No. 310095
3401 North Front Street
Post Office Box 5950
Harrisburg, PA 17110
(717) 232-5000 (phone)
(717) 236-1816 (fax)
admartin@mette.com
vlmorrison@mette.com

*Attorneys for Plaintiff,*
*HE Group, Inc.*

Date: January 24, 2020.